Daniel C. Barr (Bar No. 010149)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000
Email: DBarr@perkinscoie.com

Kevin J. Hamilton (WSBA No. 15648)
*Pro Hac Vice Application To Be Filed*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
Email: KHamilton@perkinscoie.com

*Attorneys for Plaintiffs Ron Barber for Congress,*
*Lea Goodwine-Cesarec, Laura Alessandra*
*Breckenridge, and Josh Adam Cohen*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Ron Barber for Congress; Lea Goodwine-Cesarec, Laura Alessandra Breckenridge, Josh Adam Cohen, <br><br> Plaintiffs, <br><br> v. <br><br> Ken Bennett, in his official capacity as Secretary of State of the State of Arizona; the Pima County Board of Supervisors, a body politic; Ally Miller, in her official capacity as a member of the Pima County Board of Supervisors; Ramón Valadez, in his official capacity as a member of the Pima County Board of Supervisors; Sharon Bronson, in her official capacity as a member of the Pima County Board of Supervisors; Ray Carroll, in his official capacity as a member of the Pima County Board of Supervisors; Richard Elías, in his official capacity as a member of the Pima County Board of Supervisors; the Cochise County Board of Supervisors, a body politic; | No. <br><br> **VERIFIED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

1  Patrick Call, in his official capacity as a
2  member of the Cochise County Board of
   Supervisors; Ann English, in her official
3  capacity as a member of the Cochise County
   Board of Supervisors; and Richard Searle, in
4  his official capacity as a member of the
5  Cochise County Board of Supervisors.

6              Defendants.

7

8          Plaintiffs Ron Barber for Congress, Lea Goodwine-Cesarec, Laura Alessandra

9  Breckenridge, and Josh Adam Cohen, (collectively, "Plaintiffs") file this Complaint

10 against Defendants Ken Bennett, the Pima County Board of Supervisors, the members of

11 the Pima County Board of Supervisors, in their official capacities (Ally Miller, Ramón

12 Valadez, Sharon Bronson, Ray Carroll, and Richard Elías), the Cochise County Board of

13 Supervisors, and the members of the Cochise County Board of Supervisors, in their

14 official capacities (Patrick Call, Ann English, and Richard Searle) (collectively,

15 "Defendants"), and allege as follows:

16                        **INTRODUCTION**

17     1.    As the Supreme Court has recognized:

18         No right is more precious in a free country than that of having
           a voice in the election of those who make the laws under
19         which, as good citizens, we must live. Other rights, even the
           most basic, are illusory if the right to vote is undermined.
20

21 *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S. Ct. 526, 535 (1964). The right to vote is

22 never more precious than when the initial tally of votes in an election manifests a razor

23 thin margin separating the two candidates for office. That is precisely the case in

24 Arizona's second congressional district today. The initial returns for the 2014 election for

25 United States House of Representatives in Arizona's second congressional district have

26 Martha McSally leading Ron Barber by the barest of margins—161 votes, which is less

27 than one-tenth of one percent of the votes cast in the election.

28

-2-

2.     This case concerns the ongoing disenfranchisement of at least 133 eligible Arizona voters who cast ballots in the November 2014 General Election for Arizona's second congressional district. These Arizona voters were lawfully registered to vote, and cast their ballots in accordance with state or federal law and, in many cases, as specifically directed by Arizona election officials. Not only do their votes remain uncounted, but the Pima County and Cochise County Boards of Supervisors have expressly refused to investigate their circumstances or to count their votes. Under federal and state law, these ballots must be counted with respect to all races for which such voters are eligible to vote.

3.     Indeed, in the 2014 election for the second congressional district, Arizona has failed to utilize election procedures that "are consistent with its obligation to avoid arbitrary and disparate treatment of the members of its electorate." *Bush v. Gore*, 531 U.S. 98, 105, 121 S. Ct. 525 (2000). To the contrary, arbitrary and disparate treatment of voters has been evident in the 2014 General Election.

4.     Perhaps most notably, although Arizona law does not impose any deadline by which a voter must present evidence that election officials have improperly rejected his or her ballot due to a purported "signature mismatch," officials in Pima County and Cochise County arbitrarily imposed their own deadlines. And those arbitrary deadlines are *entirely different*. Pima County refused to allow voters to cure signature mismatches after noon on November 8, and then changed the deadline to close of business on November 9. Cochise County outright refused to provide voters with *any* opportunity to resolve supposed "mismatches" after the polls closed on Election Day. Treating similarly-situated voters differently based simply on where they reside is anathema to a fair election.

5.     To prevent the Secretary of State, and the local election officials he oversees, from refusing to count ballots lawfully cast by Arizona citizens, Plaintiffs seek a temporary restraining order and preliminary injunction that (1) enjoins Defendants and all those acting in concert with them or under their direction from certifying the results of the 2014 General Election or the need for a recount in the election for United States House of Representatives in Arizona's second congressional district until the contested ballots have

1  been counted and are reflected in all other official totals of the votes for the 2014 General

2  Election for all races for which the voters casting contested ballots are eligible to vote;

3  and (2) orders Defendants and all those acting in concert with them or under their

4  direction to count the contested ballots and to include the votes reflected on those ballots

5  in their certification of the results of the 2014 General Election with respect to all races for

6  which the voters casting contested ballots are eligible to vote.

7        6.    Without an injunction, Arizona citizens, including Plaintiffs Goodwine-

8  Cesarec, Breckenridge, and Cohen will be denied the right to participate in the November

9  2014 election through arbitrary, ad hoc determinations by local election officials and/or

10  through simple mistakes made by election officials.

11        7.    All of the components for injunctive relief are satisfied here. Arizona's

12  failure to count the ballots in question and the resulting denial of the right to vote is a clear

13  violation of the Equal Protection Clause and the Due Process Clause of the Fourteenth

14  Amendment to the United States Constitution, the Help America Vote Act, the Arizona

15  Constitution, and Arizona law, and Plaintiffs thus have a strong likelihood of prevailing

16  on the merits. The harm to Plaintiffs and similarly situated voters is irreparable; indeed,

17  there are few harms greater and more impossible to repair than being stripped of the

18  constitutional right to vote. Moreover, Arizona's post-election statutory framework

19  provides no effective remedy for a voter whose vote was rejected in error where election

20  officials did not engage in willful "misconduct." And it is beyond dispute that there is a

21  compelling public interest in protecting the voting rights of Arizona citizens and ensuring

22  the integrity of elections.

23        8.    The need for relief is urgent. The Boards of Supervisors for Pima County

24  and Cochise County have already refused to count the ballots in question. The Secretary

25  of State is scheduled to certify the election results on December 1, 2014. Absent relief

26  from this Court, Plaintiffs have no other means of ensuring that their votes—and the

27  lawfully cast votes of all Arizona citizens—are counted.

28

-4-

**PARTIES**

9. Plaintiff Ron Barber for Congress is the principal campaign committee of Ron Barber, an Arizona citizen and resident of the second congressional district. Congressman Barber is the incumbent, and currently represents the second congressional district in the United States House of Representatives. Congressman Ron Barber was a candidate on the November 4, 2014 General Election ballot for the United States House of Representatives for the second congressional district.

10. Plaintiff Lea L. Goodwine-Cesarec is a resident of Pima County. She is an eligible, registered voter. Ms. Goodwine-Cesarec cast a ballot in the November 4, 2014 General Election that has been rejected and not counted by the Pima County Board of Supervisors.

11. Laura A. Breckenridge is a resident of Pima County. She is an eligible, registered voter. Ms. Breckenridge cast a ballot in the November 4, 2014 General Election that has been rejected and not counted by the Pima County Board of Supervisors.

12. Plaintiff Josh A. Cohen is a resident of Pima County. He is an eligible, registered voter. Mr. Cohen cast a ballot in the November 4, 2014 General Election that has been rejected and not counted by the Pima County Board of Supervisors.

13. Defendant Ken Bennett is sued in his official capacity as Secretary of State of the State of Arizona. Defendant Bennett is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint. As Secretary of State, Defendant Bennett serves as the chief elections officer of the State. Defendant Bennett's duties consist, among of other things, of issuing a certificate of election to the candidate receiving the highest number of votes cast pursuant to state law. *See, e.g.*, A.R.S. §§ 41-121(A)(6), 16-650.

14. The Pima County Board of Supervisors is the duly elected governing body of Pima County, a body politic, organized and existing under the laws of the State of Arizona. Under Arizona law, the Pima County Board of Supervisors must meet to canvass the returns and report those returns to the Secretary of State.

15.     Defendant Ally Miller is sued in her official capacity as a member of the Pima County Board of Supervisors. Defendant Miller is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint. As a member of the Board, Defendant Miller is responsible for the administration of elections, including the canvassing of return and other aspects of elections and voting procedures in Pima County.

16.     Defendant Ramón Valadez is sued in his official capacity as a member of the Pima County Board of Supervisors. Defendant Valadez is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint. As a member of the Board, Defendant Valadez is responsible for the administration of elections, including the canvassing of return and other aspects of elections and voting procedures in Pima County.

17.     Defendant Sharon Bronson is sued in her official capacity as a member of the Pima County Board of Supervisors. Defendant Bronson is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint. As a member of the Board, Defendant Bronson is responsible for the administration of elections, including the canvassing of return and other aspects of elections and voting procedures in Pima County.

18.     Defendant Ray Carroll is sued in his official capacity as a member of the Pima County Board of Supervisors. Defendant Carroll is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint. As a member of the Board, Defendant Carroll is responsible for the administration of elections, including the canvassing of return and other aspects of elections and voting procedures in Pima County.

19.     Defendant Richard Elías is sued in his official capacity as a member of the Pima County Board of Supervisors. Defendant Elías is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint. As a member of the Board, Defendant Elías is responsible for the

1    administration of elections, including the canvassing of return and other aspects of
2    elections and voting procedures in Pima County.

3        20.    The Cochise County Board of Supervisors is the duly elected governing
4    body of Cochise County, a body politic, organized and existing under the laws of the State
5    of Arizona. Under Arizona law, the Cochise County Board of Supervisors must meet to
6    canvass the returns and report those returns to the Secretary of State.

7        21.    Defendant Patrick Call is sued in his official capacity as a member of the
8    Cochise County Board of Supervisors. Defendant Call is a person within the meaning of
9    42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this
10   complaint. As a member of the Board, Defendant Call is responsible for the
11   administration of elections, including the canvassing of return and other aspects of
12   elections and voting procedures in Cochise County.

13       22.    Defendant Ann English is sued in her official capacity as a member of the
14   Cochise County Board of Supervisors. Defendant English is a person within the meaning
15   of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this
16   complaint. As a member of the Board, Defendant English is responsible for the
17   administration of elections, including the canvassing of return and other aspects of
18   elections and voting procedures in Cochise County.

19       23.    Defendant Richard Searle is sued in his official capacity as a member of the
20   Cochise County Board of Supervisors. Defendant Searle is a person within the meaning of
21   42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this
22   complaint. As a member of the Board, Defendant Searle is responsible for the
23   administration of elections, including the canvassing of return and other aspects of
24   elections and voting procedures in Cochise County.

25                          **JURISDICTION AND VENUE**

26       24.    Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the
27   deprivation under color of state law of rights secured by the United States Constitution.

28

-7-

25.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

26.     This Court has supplemental jurisdiction over Plaintiffs' state law claim (Fourth and Sixth Claims for Relief) pursuant to 28 U.S.C. § 1367(a).

27.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events that gave rise to Plaintiffs' claims took place within the District of Arizona.

28.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

29.     This Court has personal jurisdiction over Defendants.

**FACTUAL ALLEGATIONS**

**A.     The November 4, 2014 General Election**

30.     Arizona held its General Election on November 4, 2014. One of the offices on the ballot was the position of representative for Arizona's second congressional district.

31.     The second congressional district is comprised of Cochise County and a portion of Pima County. The Democratic candidate is Congressman Ron Barber. The Republican candidate is Martha McSally.

**B.     Overview of The Post-Election Canvass Process**

32.     Subsequent to Election Day, local election officials conduct a canvassing process to determine the total number of votes properly cast in the election for each candidate. No later than 20 days (i.e., November 24, 2014) after the general election, each county's Board of Supervisors must meet to canvass the returns and report those returns to the Secretary of State.

33.     On or before the fourth Monday following the general election (December 1, 2014), the Secretary of State must, in the presence of the Governor and Attorney General, canvass the returns and immediately certify the result to the Governor. If the

Secretary of State does not receive the official canvass from any county by the fourth Monday following the general election, the Secretary of State may postpone its canvass. The Secretary of State cannot postpone the canvass more than 30 days from Election Day.

34.     After completing the canvass, the Secretary of State declares elected the person receiving the highest number of votes cast for each office and delivers a signed, sealed certificate of election to each prevailing candidate. A.R.S. § 16-650.

35.     As of the date this Complaint is filed, local election officials have just completed the process of canvassing the election returns. During the canvassing process, Plaintiffs learned that election officials have wrongfully rejected a substantial number of early and provisional ballots.

### C.     Overview of Arizona's Early Voting System

36.     Arizona maintains an early voting system wherein early voters may either vote in person at an early voting station or vote by mail.

37.     If a voter is in possession of an early ballot but insists on voting in person on Election Day, he or she must be allowed to do so by provisional ballot upon providing acceptable identification. *See* A.R.S. § 16-579(B). So long as the voter has not already cast the early ballot, he or she is allowed to vote by provisional ballot. *Id.*

38.     Voters who elect to vote early by mail mark the ballot, enclose and seal it, execute the affidavit provided on the envelope. *See id.* § 16-547. The voter may return the ballot by mail to the County Recorder in the envelope provided or deliver it to any polling place in the voter's county of residence. *Id.*

39.     Early ballots are evaluated by the Early Election Board, which is appointed by the county Board of Supervisors. *See id.* § 16-547. The Early Election Board may reject an early ballot for the following reasons: (1) the Board determines that the voter's early ballot affidavit signature does not match the signature on file, (2) the affidavit is determined to be insufficient, or (3) the person who voted is not an elector. *See* Secretary of State's Election Procedures Manual (the "Manual"), at 167.

40.     If the Board determines that signatures do not match, it rejects the ballot unless it receives and accepts an explanation from the voter that he or she did vote the ballot and as to why the signatures do not match. *Id.* It is important to note that Arizona law does not impose any deadline by which a voter must provide the requisite explanation.

### D.     Overview of Arizona's Provisional Ballot System

41.     Under Arizona law, a person claiming the right to vote, but who is not allowed to vote by poll workers, must be allowed to mark a provisional ballot if any of the following circumstances apply: (1) the voter has not provided sufficient identification at the poll; (2) the voter's name does not appear on the signature roster or inactive list and the voter has not moved; (3) the voter has moved; (4) the voter was issued an early ballot; (5) the voter changed his or her name; or (6) the voter is challenged at the polling place. *See* A.R.S. § 16-584.

42.     At the time of voting a provisional ballot, the voter signs an affirmation on the ballot envelope stating that the information is correct, that he or she resides in the precinct and is eligible to vote in the election, and that he or she has not previously voted in the election. *See* A.R.S. § 16-584; *see also* Manual at 151. The voter or poll worker completes a provisional ballot form, which both sign. *See* Manual at 152. The form is attached to the provisional ballot envelope, which the voter returns to the appropriate election official. *Id.* The voter receives a provisional voter receipt with information on how to contact the County Recorder to verify the status of the provisional ballot. *Id.* The voter is then entered on the provisional ballots page at the back of the signature roster or a separate provisional roster. *Id.*

43.     The County Recorder must verify all provisional ballots for proper registration within 10 calendar days after the general election. *See* A.R.S. § 16-584. The "provisional ballot[s] shall be counted" if (1) the registration of the voter is verified and the voter is eligible to vote in the precinct, (2) the voter's signature does not appear on any on any other signature roster for that election, and (3) the voter did not vote early or vote on Election Day. Manual at 185. The affidavit on a provisional ballot envelope is

1   sufficient if the voter signs it, and if the signature matches the signature on the voter's

2   registration. *See id.* at 182.

3        44.   If the voter has moved within the precinct, and thus his or her name is on the

4   voter register but the address on the identification does not match the signature roster, the

5   voter is given a provisional ballot. A.R.S. § 16-135. If the voter has moved to a different

6   residence within the county but outside the precinct, the voter must be directed to the

7   polling place for the new address. *Id.* §§ 16-122, 16-583.

8        45.   Election officials must direct voters to the proper polling place because

9   A.R.S. § 16-584 prevents election officials from counting a provisional ballot if it is cast

10   outside the voter's own precinct, including votes for statewide offices. For the reasons

11   stated below, this statute as applied in this circumstance is unconstitutional.

12        46.   With the limited exception of provisional ballots rejected due to purportedly

13   inadequate registration and identification, Arizona maintains no system or scheme under

14   which provisional voters whose ballots are rejected may provide information to election

15   officials to prove that their ballots were, in fact, properly cast.

     **E.**    **Election Officials Have Wrongfully Rejected a Substantial Number of Early and Provisional Ballots**

18        47.   It has become apparent that local election officials in the second

19   congressional district improperly rejected some properly-cast ballots and gave voters

20   incorrect information that prevented them from exercising their right to vote. The errors

21   Plaintiffs have identified fall into several different categories. More than 130 voters in the

22   second congressional district, including Plaintiffs Goodwine-Cesarec, Breckenridge, and

23   Cohen had their ballots improperly rejected for one or more of the reasons listed below. In

24   many cases, it is clear that voters who unquestionably complied with state law were

25   disenfranchised through simple mistakes by government officials. In other cases, election

26   officials have arbitrarily refused to allow voters to submit evidence verifying that their

27   ballots were properly cast. In still other cases, voters were disenfranchised because

28

election workers provided inaccurate information that prevented voters, on Election Day, from casting ballots in full compliance with Arizona state law.

### 1. Voters Who Moved Within Pima County And Nonetheless Had Their Provisional Ballot Rejected

48.     Election officials erroneously rejected the provisional ballots of certain voters who had moved within Pima County but had not updated their residential address in their voter registration records prior to Election Day.

49.     Arizona law is clear that "[a]n elector who moves from the address at which he is registered to another address within the same county and who fails to notify the county recorder of the change of address before the date of an election shall be permitted to correct the voter registration records at the appropriate polling place for the voter's new address," A.R.S. § 16-135(B); that after presenting identification and affirming the new residence address in writing, the voter ''shall be permitted to vote a provisional ballot," *id.*; and that if the voter's signature does not appear on the signature roster for that election in the precinct in which the voter was listed (i.e., where the voter previously resided) and there is no record of the voter having voted early for that election, "the provisional ballot shall be counted," *id.* § 16-135(D).

50.     Voters who moved within Pima County and cast provisional ballots at their polling location fully complied with the requirements of Arizona law.

51.     For example, prior to Election Day, Suzanne E. Pasch moved within Tucson prior to Election Day, and was directed by the County Recorder's Office to the polling place for her new address. The poll worker instructed her to vote a provisional ballot. Ms. Pasch's provisional ballot was rejected.

52.     The ballots of at least three voters were rejected in these circumstances.

2. **Voters Who Signed Both Their Registration Form and Their Ballot Affidavit And Nonetheless Had Their Ballot Rejected Due to a Purported "Signature Mismatch"**

53.     Election officials also rejected a number of ballots cast by early and/or provisional voters because of their erroneous determination that the voter's signature on the ballot affidavit did not "match" the signature on the voter's registration form.

54.     Upon learning that their ballot had been rejected due to a purported signature mismatch, these voters promptly contacted local election officials to validate their signatures. Despite these voters providing sworn testimony that they had signed both the ballot affidavit and the registration form, election officials have refused to count these ballots.

55.     For example, Plaintiff Breckenridge voted an early ballot that was rejected because of a purported signature mismatch. Ms. Breckenridge signed both the ballot affidavit and the registration form. Upon learning that her ballot had been rejected in error, she contacted election officials to validate her signature. Nonetheless, her ballot has not been counted.

56.     The ballots of at least 27 voters were rejected in similar circumstances.

57.     Voters who signed both their voter registration form and their early or provisional ballot affidavit fully complied with the requirements of Arizona law.

58.     Defendants fail to provide sufficient training and employ sufficiently clear and uniform standards to ensure that election workers treat voters equally in the "signature match" process. The result of these discretionary, subjective determinations made by individuals untrained in handwriting analysis is that some voters who signed both their voter registration form and their ballot affidavit had their voters counted, whereas others who did the same had their ballot rejected.

3. **Unsigned Early and Provisional Ballots**

59.     As set out above, Arizona allows election officials who have identified a purported signature "mismatch" to accept an explanation from the voter that he or she did vote the ballot and as to why the signatures do not match. Arizona has not adopted a

-13-

1   similar procedure to allow voters who inadvertently failed to sign their early or

2   provisional ballot affidavit to present evidence to election officials that they did, in fact,

3   vote the ballot. Such voters have no recourse under state law.

4       60.   Until approximately the Thursday before Election Day, in at least some

5   instances, Pima County mailed back ballots to early voters who failed to sign their ballot

6   affidavit to provide an opportunity for such voters to correct the error. Thereafter, Pima

7   County refused to provide a similar opportunity (although it did provide a continuing

8   opportunity to "cure" signature mismatch ballots). Because voters can return early ballots

9   up to 7:00 p.m. on Election Day, A.R.S. § 16-548, this means that some early voters who

10   failed to sign their ballot affidavit were given an opportunity to cure the oversight; others

11   were not. Cochise County, by contrast, called at least some such voters prior to Election

12   Day to inform them of the oversight and/or sent an affidavit for the voters to return by

13   Election Day. It provided no similar opportunity to early voters who returned early ballots

14   shortly before Election Day, and no opportunity at all after Election Day.

15       61.   Pima County and Cochise County have informed the Ron Barber for

16   Congress campaign that some early and provisional ballots were rejected because the

17   ballot affidavit was not signed.

18       62.   In at least some instances, voters casting unsigned provisional ballots were

19   expressly informed by poll workers that their votes would be counted. For example, Elle

20   Grace Troutman, who has been registered to vote in Arizona since 2000, legally changed

21   her name in September 2014 but received a mail-in ballot that had her previous name

22   associated with it. On Election Day, Ms. Troutman went to the polls and was directed to

23   fill out a provisional ballot. After she filled out the ballot, the poll worker looked over the

24   ballot, said that things appeared to be in order, and indicated that Ms. Troutman's

25   provisional ballot would be counted. The poll worker did not point out to her that

26   Ms. Troutman had not signed the provisional ballot. Her vote was not counted.

27

28

83694-0002/LEGAL124229467.6

63.     The Pima County and Cochise County Board of Supervisors have refused to provide voters who inadvertently failed to sign their ballot affidavits with an opportunity to cure this oversight. The ballots of 16 voters were rejected in these circumstances.

**4.      Failure By Election Officials to Direct Voters Who Had Moved To the Proper Precinct**

64.     Election officials in Pima County and Cochise County owe a mandatory statutory duty to direct voters who have moved to a different residence within the county but outside the precinct at which they appear on Election Day to the polling place for the new address. In numerous cases on Election Day, instead of complying with their mandatory statutory duty, such election officials instead mistakenly instructed such voters to cast a provisional ballot, which was then rejected. Such voters were disenfranchised due to election official error or oversight.

65.     For example, in January 2014, Plaintiff Cohen moved and had the address on his driver's license changed. He did not know that he also needed to change his address for purposes of his voter registration. On Election Day, Mr. Cohen went to the polling location for his previous address. He informed the poll worker that he had moved, and the poll worker instructed him to vote a provisional ballot. Mr. Cohen was assured that his vote would be counted; it was not.

66.     Likewise, Plaintiff Goodwine-Cesarec moved more than a month before Election Day, and called the registrar to update her voting address. The registrar assured her that she could change her voting address by phone and did not need to sign any forms to do so. When she arrived at the polls on Election Day, she was informed that there was no record of her change of address. Rather than directing her to another polling place, poll workers directed her to cast a provisional ballot and told her that they expected the vote would be counted; it was not.

67.     The ballots of at least 31 voters were rejected in similar circumstances. The Pima County and Cochise County Boards of Supervisors have refused to include these ballots in the certification of the 2014 General Election.

### 5. Misleading or Erroneous Statements by Election Officials regarding Voting in Proper Precinct

68.     In numerous instances, eligible, registered voters who inadvertently went to the "wrong" polling place on Election Day were not directed to the proper polling place or informed that they would not have their votes counted unless they did so. Rather, election officials assured such voters that they could cast provisional ballots, that such ballots would be counted, and that they need not travel to another polling place. In some cases, election officials actively discouraged voters from going to the proper precinct to vote. The provisional ballots cast by these voters were then rejected. Such voters were disenfranchised due to election official error or oversight.

69.     For example, Michelle Rankin, who had previously received but not voted an early ballot, went to the wrong precinct on Election Day. When she was realized she had gone to the wrong precinct, she told a poll worker that she would return home to get and return her early ballot. The poll worker told her that there was no need for her to do so and that her provisional ballot would count as long as she was registered. Ms. Rankin's provisional vote was rejected.

70.     The ballots of at least 11 voters were rejected in these circumstances. The Pima County and Cochise County Boards of Supervisors have refused to include these ballots in the certification of the 2014 General Election.

### 6. Voters Who Were Not Told They Were In the Wrong Precinct

71.     In other instances, eligible, registered voters inadvertently went to the "wrong" polling place on Election Day and were not instructed to go to the proper polling location or that their votes would not count if they did not do so. Such voters were completely disenfranchised even though they were qualified to vote for most of the elections on their ballot.

72.     The ballots of at least 45 voters were rejected in these circumstances. The Pima County and Cochise County Boards of Supervisors have refused to include these ballots in the certification of the 2014 General Election.

**F.      Election Officials Have Refused to Correct These Errors**

73.     Each county's Board of Supervisors must meet to canvass the returns and report those returns to the Secretary of State no later than 20 days after the election. A.R.S. § 16-642. This year, the 20th day from the election is November 24, 2014.

74.     In 2012, the Pima County Board of Supervisors canvassed the returns on the last possible day. This year, without explanation or justification and despite the narrow margin separating the candidates, the Board accelerated the canvassing meeting by almost a full week, to November 18, 2014.

75.     On Tuesday, November 18, 2014, the Ron Barber for Congress campaign notified the Pima County Board of Supervisors of the categories of errors outlined above, submitted sworn declarations documenting such errors, and requested that the Board defer its certification, investigate these issues, correct any errors and count the ballots that had been improperly rejected. The Board refused to delay the canvassing to either allow the Ron Barber for Congress campaign to conduct further investigation into the scope of these errors or to itself conduct an investigation. Instead, that same day, the Pima County Board of Supervisors voted to approve the election results for Pima County without asking the Recorder for any explanation, addressing any of the errors identified by the Ron Barber for Congress campaign or including any of the ballots in question in the count.

76.     On Wednesday, November 19, the Ron Barber for Congress campaign sent a letter to the Cochise County Board of Supervisors that enclosed sworn declarations from voters documenting similar errors and requesting that the Board correct these errors and count the ballots. The Board refused to delay the canvassing either to allow the Ron Barber for Congress campaign to conduct further investigation into the scope of these errors or to itself conduct an investigation. Instead, on November 20, the Board voted to approve the election results for Cochise County without addressing any of the errors identified by the Ron Barber for Congress campaign or including any of the ballots in question in the count.

77.    On Friday, November 21, the Ron Barber for Congress campaign sent a letter to the Secretary of State that enclosed sworn declarations from voters documenting similar errors and requesting that the Secretary take steps to review these declarations and either direct the Pima and Cochise County Boards of Directors to investigate, count these ballots, and amend their certification, or, alternatively, to conduct that investigation directly as part of the state canvassing and certification process. As of this date, the Secretary of State has not responded to this request.

## FIRST CLAIM FOR RELIEF
**Equal Protection**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
*Arbitrary and Disparate Treatment of Similarly-Situated Voters*
*(Bush v. Gore)*

78.    Plaintiffs incorporate by reference and reallege paragraphs 1 to 77 of this complaint.

79.    The Constitution of the United States protects the right of all qualified citizens to vote. The right to vote is fundamental and is one of the most important rights in our democratic society. It is protected by Articles I and II of the Constitution and the First and Fourteenth Amendments.

80.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees qualified voters a substantive right to participate equally with other qualified voters in the electoral process. The Equal Protection Clause applies to the right to vote in state elections and protects the state electoral franchise. *See Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). By arbitrarily counting or rejecting ballots from identically situated voters, Defendants are denying voters, including Plaintiffs Goodwine-Cesarec, Breckenridge, and Cohen, the right to vote in violation of the Equal Protection Clause.

81.     The substantive right to participate equally with other voters in the electoral process is not just protected in the initial allocation of the franchise; equal protection applies to the manner of its exercise as well. *See Bush v. Gore*, 531 U.S. 98, 104 (2000). A state may not arbitrarily impose disparate treatment on similarly situated voters.

82.     As set out above, in the conduct of the November 2014 election for the second congressional district, the State of Arizona has treated similarly-situated voters differently in determining whether they are permitted to exercise the electoral franchise. Among other things, Pima County and Cochise County employed arbitrary and disparate deadlines by which a voter could remedy the improper rejection of his or her ballot due to purported signature "mismatch." Likewise, Pima County and Cochise County employed arbitrary and disparate procedures with regard to voters who inadvertently failed to sign a ballot affidavit.

83.     Arizona arbitrarily and without explanation or justification provides *some* opportunity for voters to prove they cast a ballot rejected due to supposed signature mismatch, but inexplicably provides *no* opportunity for voters who inadvertently failed to sign an early ballot (after election day) or a provisional ballot affidavit (at any time) to correct those errors.

84.     In order to comply with the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, all laws that treat citizens differently must be rationally related to a legitimate state interest. Where a voter is disenfranchised due to election worker error, and submits evidence prior to the certification of the election that his or her ballot was properly cast (or he or she was prevented from casting his or her ballot due to election worker error), the State's refusal to correct its own errors is not rationally related to a legitimate state interest.

83694-0002/LEGAL124229467.6

**SECOND CLAIM FOR RELIEF**
**Equal Protection**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
*Undue Burden on the Right to Vote*
*(Burdick v. Takushi)*

85.  Plaintiffs incorporate by reference and reallege paragraphs 1 to 84 of this complaint.

86.  Under the Equal Protection Clause, a State cannot utilize election practices that unduly burden the right to vote. The practices outlined above all impose a severe burden—disenfranchisement—on the right to vote of the voters who cast those ballots. Refusing to count these ballots does not serve any legitimate state interest.

87.  Scores of eligible, registered Arizona voters, including Plaintiffs Goodwine-Cesarec, Breckenridge, and Cohen are suffering direct and irreparable injury from Defendants' improper and arbitrary refusal to count their ballots. Without relief from this Court, these voters will be deprived of their right to vote in the November election.

88.  Based on the foregoing, Defendants, acting under color of state law, have deprived and will continue to deprive Plaintiffs Goodwine-Cesarec, Breckenridge, and Cohen and other similarly-situated Arizona voters of equal protection under the law secured to them by the Fourteenth Amendment to the United States Constitution and protected by 42 U.S.C. § 1983.

**THIRD CLAIM FOR RELIEF**
**Due Process**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**

89.  Plaintiffs incorporate by reference and reallege paragraphs 1 to 88 of this complaint.

90.  The Due Process Clause to the Fourteenth Amendment of the United States Constitution provides that no state "shall deprive any person of life, liberty, or property, without due process of law." This provision guarantees substantive due process and

83694-0002/LEGAL124229467.6

1    prohibits a state from depriving a person of "life, liberty, or property" without an

2    appropriately compelling government interest.

3        91.    The liberties protected by the Due Process Clause include the right to vote

4    and to be free from disparate treatment in the exercise of the electoral franchise, which are

5    fundamental liberties at the core of our democracy.

6        92.    By subjecting voters to disparate treatment in the exercise of the electoral

7    franchise without an appropriately compelling government interest, Defendants are

8    denying Plaintiffs Goodwine-Cesarec, Breckenridge, and Cohen and other similarly-

9    situated Arizona voters the right to vote in violation of the Due Process Clause and

10   without any legitimate government interest.

11       93.    Based on the foregoing, Defendants, acting under color of state law, have

12   deprived and will continue to deprive Plaintiffs of the substantive due process of law

13   secured to them by the Fourteenth Amendment to the United States Constitution and

14   protected by 42 U.S.C. § 1983.

15

16                          **FOURTH CLAIM FOR RELIEF**
                            **Ariz. Const. Art. II, § 21**

17       94.    Plaintiffs incorporate by reference and reallege paragraphs 1 to 93 of this

18   complaint.

19       95.    Article 2, Section 21, of the Arizona Constitution provides that "all elections

20   shall be free and equal" and guarantees that "no power, civil or military, shall at any time

21   interfere to prevent the free exercise of the right of suffrage." Article 2, section 21 is

22   violated when votes are not properly counted.

23       96.    Where, as alleged herein, voters have taken every step required of them and

24   the same steps as other voters whose ballots were counted, and have eliminated any

25   plausible concern with the counting of their ballots, a refusal to count those voters' ballots

26   constitutes an interference with the free exercise of the right of suffrage and violates the

27   constitutional guarantee of elections that are "free and equal." Because of the errors set

28

out above, a substantial number of votes will not be properly counted, in violation of the Arizona Constitution.

### FIFTH CLAIM FOR RELIEF
#### Help America Vote Act
#### 52 U.S.C. § 21082(a)(4)

97.     Plaintiffs incorporate by reference and reallege paragraphs 1 to 96 of this complaint.

98.     Under the Help America Vote Act ("HAVA"), "[i]f the appropriate State or local election official to whom [a] [provisional] ballot or voter information is transmitted . . . determines that the individual is eligible under State law to vote, the individual's provisional ballot shall be counted as a vote in that election in accordance with State law." 52 U.S.C. § 21082(a)(4).

99.     Because all of the provisional ballots described herein were, in fact, cast by voters who are eligible to vote under state law, the plain language of 52 U.S.C. § 21082(a)(4) requires that these votes shall be counted.

### SIXTH CLAIM FOR RELIEF
#### Violations of Arizona Election Law
#### A.R.S. §§ 16-579, 16-583, 16-584, Election Procedures Manual (2014)

100.    Plaintiffs incorporate by reference and reallege paragraphs 1 to 99 of this complaint.

101.    Arizona law provides that "[a]ny qualified elector who is listed as having applied for an early ballot but who states that the elector has not voted and will not vote an early ballot for this election or surrenders the early ballot to the precinct inspector on election day, shall be allowed to vote" a provisional ballot. A.R.S. § 16-579(B). "[I]f there is no indication that the voter voted an early ballot, the provisional ballot envelop shall be opened and the ballot shall be counted." *Id.* § 16-584(D).

102.    Arizona law requires election officials to accept early and provisional ballots that are cast by eligible, registered voters who sign both their registration form and

-22-

the ballot affidavit. If election officials make the preliminary determination that the signature on a voter's registration form does not "match" the signature on the voter's ballot affidavit, election officials must afford the voter the opportunity to explain "that he or she did vote the ballot and . . . why the signatures do not match." Manual at 167.

103.   Election officials also rejected a number of ballots cast by early and/or provisional voters because of their erroneous determination that the voter's signature on the ballot affidavit did not "match" the signature on the voter's registration form. Although Arizona law contains no pre-certification deadline by which voters must provide evidence that their signatures do, in fact, "match," Pima County and Cochise County election officials have refused to count the ballots of voters who have informed election officials that they signed both the ballot affidavit and the registration form and/or provided sworn testimony to that effect to the Board of Supervisors.

104.   As a matter of state law, if a voter informs an election official at a polling place that he or she lives in a new residence, "the election official *shall* direct the registrant to the polling place for the new address." A.R.S. § 16-583(A) (emphasis added). This is a mandatory obligation.

105.   In numerous cases on Election Day, election officials in Pima County and Cochise County failed to comply with their mandatory statutory duty to direct certain voters to the proper polling place. Instead of complying with their mandatory statutory duty, such election officials instead mistakenly instructed such voters to cast a provisional ballot, which was then rejected. Such voters were disenfranchised due to election official error.

## DECLARATORY AND INJUNCTIVE RELIEF
### 28 U.S.C. §§ 2201 and 2202, Fed. R. Civ. P. 57 and 65

106.   Plaintiffs incorporate by reference and reallege paragraphs 1 to 105 of this complaint.

107.   This case presents an actual controversy because Defendants' present and ongoing refusal to count the validly cast ballots of Plaintiffs and similarly-situated voters

subjects them to serious and immediate harms, warranting the issuance of a declaratory judgment.

108.    Plaintiffs seek preliminary and/or permanent injunctive relief to protect their statutory and constitutional rights and avoid the injuries described above. A favorable decision enjoining Defendants would redress and prevent the irreparable injuries to Plaintiffs identified herein, for which Plaintiffs have no adequate remedy at law or in equity.

109.    The State will incur little to no burden in counting the votes of eligible, registered voters who have been disenfranchised through no fault of their own. The results of the 2014 election for the second congressional district have not yet been certified. Any minor administrative burden imposed on the State in processing and including in the canvass results improperly-rejected ballots pales in comparison to the fundamental constitutional injury of denial of the right to vote that Plaintiffs will suffer in the absence of the relief requested. The balance of hardships thus tips strongly in favor of Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

A.    Declaring that the votes reflected on the ballots submitted by the voters identified in the declarations attached to Plaintiffs' motion for temporary restraining order and preliminary injunction, filed this same day, (the "contested ballots") must be counted and included in Defendants' certification of the results of the 2014 General Election, with respect to all races for which the voter was eligible to vote, and any certification of the need for a recount in the election for United States House of Representatives in Arizona's second congressional district.

B.    Preliminarily and permanently enjoining Defendants and all those acting in concert with them or under their direction from certifying the results of the 2014 General Election or the need for a recount in the election for United States House of Representatives in Arizona's second congressional district until the contested ballots have been counted and are reflected in all other official totals of the votes for the 2014 General

-24-

1   Election with respect to all races for which voters casting contested ballots are eligible to
2   vote; and ordering Defendants and all those acting in concert with them or under their
3   direction to count the contested ballots and to include the votes reflected on those ballots
4   in their certification of the results of the 2014 General Election, any certification of the
5   need for a recount in the election for United States House of Representatives in Arizona's
6   second congressional district, and all other official totals of the votes for the 2014 General
7   Election.

8         C.     Preliminarily and permanently enjoining enforcement by Defendants of
9   Arizona Revised Statute § 16-584 and any other sources of state law that requires election
10  officials to reject provisional ballots cast by eligible, registered voters in the wrong
11  precinct with respect to all races in which the voter is entitled to cast a vote.

12        D.     Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees
13  pursuant to, *inter alia*, 42 U.S.C. § 1988 and other applicable laws; and

14        E.     Granting such other and further relief as the Court deems just and proper.

16  November 24, 2014          **PERKINS COIE** LLP

18        By: <u>s/ Daniel C. Barr</u>
19          Daniel C. Barr
            2901 North Central Avenue, Suite 2000
20          Phoenix, Arizona 85012-2788

21          Kevin J. Hamilton
            *Pro Hac Vice Application To Be Filed*
22          1201 Third Avenue, Suite 4900
            Seattle, WA 98101-3099

24          *Attorneys for Plaintiffs Ron Barber for*
            *Congress, Lea Goodwine-Cesarec, Laura*
25          *Alessandra Breckenridge, and Josh Adam*
            *Cohen*

VERIFICATION

     Kyle Quinn-Quesada, declares that he/she is the campaign manager of Ron Barber for Congress, and that he/she is authorized to make this verification for and on behalf of Ron Barber for Congress; that he/she has read the foregoing Complaint for Injunctive and Declaratory Relief, and knows the contents thereof; and that the same is true of his/her own knowledge except as to the matters therein stated to be alleged upon information and belief, and, as to those matters, he/she believes them to be true.

     I declare under penalty of perjury that the foregoing is true and correct.

     Dated this 24th day of November, 2014



1

**CERTIFICATE OF SERVICE**

2          ☒          I hereby certify that on November 24, 2014, I electronically transmitted the

3    attached documents to the Clerk's Office using the CM/ECF System for filing.

4          ☒          I hereby certify that, I will serve the attached document once a Judge is

5    assigned to the matter, United States District Court of Arizona, 405 West Congress Street,

6    Tucson, Arizona 85701.

7

8                                                    s/ S. Neilson

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28