WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Ron Barber for Congress, et al., | No. CV-14-02489-TUC-CKJ |
| Plaintiffs, | **ORDER** |
| v. | |
| Ken Bennett, et al., | |
| Defendants. | |

On November 24, 2014, the Plaintiffs filed a Verified Complaint and Application for Temporary Restraining Order (TRO), Preliminary Injunction and Declaratory Relief. The Plaintiffs are Ron Barber for Congress and three residents of Pima County, Lea Goodwine-Cesarec, Laura Alessandra Breckenridge, and Josh Adam Cohen. The Defendants are Ken Bennett, Secretary of State; the Pima County Board of Supervisors, and Board members Ally Miller, Ramon Valdez, Sharon Bronson, Ray Carroll, and Richard Elias; and the Cochise County Board of Supervisors and Board members Patrick Call, Ann English, and Richard Searle. Martha McSally for Congress and Martha McSally (collectively, "McSally") have moved to intervene, filed an opposition, and a Motion to Dismiss. (Docs. 11, 12, 13.) Defendant Bennett has joined in the Opposition to the Motion for a Preliminary Injunction and the Motion to Dismiss. (Docs. 18, 19.) Plaintiffs have filed a Reply. (Doc. 22.)

This Order addresses the Application for a Temporary Restraining Order (TRO). Oral argument was heard on this matter on November 26, 2014. The Court having

considered the pleadings and arguments presented will deny Plaintiffs' request for a Temporary Restraining Order for the reasons stated herein.

**I.      Background**

The general election was held on November 4, 2014.  The initial returns indicate that Martha McSally leads the incumbent, Congressman Ron Barber, by a very small margin of 161 votes—less than one-tenth of one percent of the votes cast—in the election for Arizona's second district. [Hamilton Decl. ¶ 6] Each county's Board of Supervisors must meet to canvass the returns and report those returns to the Secretary of State by November 24, 2014.  The Secretary of State must certify the election results to the Governor on December 1, 2014, pursuant to A.R.S. § 16-648.

Plaintiffs assert that 133 contested ballots have not been counted and they ask that the Secretary of State, who must certify the results of the general election or the need for a recount of the votes for the United States House of Representatives second congressional district seat, be restrained from certifying the results until after the ballots have been counted.  The Preliminary Injunction asks that the other defendants count the votes.   (Doc. 2 at 1.)   If the Court does not both enjoin the certifying and order Defendants Pima County and Cochise County to count some or all of the problematic votes, then those votes are forever lost and even in a recount will not be considered.  No party disputes this, nor is there statutory authority to count the votes after the Secretary of State certifies the result.

According to the Plaintiffs, both the Pima County and Cochise County Board of Supervisors refused to count several categories of ballots.  Specifically, they allege:

1. Voters who moved within Pima County and who cast provisional ballots (3 contested ballots);

2. County official wrongly believed that the signature on the affidavit for the early ballot did not match the signature on the voter registration form (27 contested ballots);

3. Early ballots were not signed (8 contested ballots);

4. Provisional ballots were not signed (8 contested ballots);

5. Voters who moved were not directed to the proper precinct by election officials (31 contested ballots);

6. Election officials made misleading or erroneous statements regarding voting in the proper precinct (11 contested ballots); and

7. Voters were not told they were in the wrong precinct (45 contested ballots).

Plaintiffs raise claims under the Equal Protection and Due Process Clauses of the Federal Constitution; the State Constitution Art. II, 21 providing that "elections shall be free and equal" and no power shall interfere to prevent free exercise of suffrage; federal statute, Help America Vote Act (52 USC § 21082(a)(4)); and state statutes (A.R.S. §§ 16-579, 583, 584).  (Doc. 1.)

## II.    Legal Standard for TRO

The test for a TRO is the same as for a preliminary injunction; a preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted) (emphasis in original). The Ninth Circuit has adopted two tests a district court must use when deciding whether to grant a preliminary injunction. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (finding District Court "made an error of law" by employing only one test when denying preliminary injunction). First, a plaintiff can attempt to satisfy the four-part test adopted by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). Under the *Winter* test, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. If a plaintiff cannot meet the *Winter* test, he may attempt to satisfy the second test by showing there are "serious questions going to the merits," the balance of hardships tips sharply in his favor, there is a likelihood of irreparable injury, and the injunction is in the public interest. *Cottrell*, 632 F.3d at 1135. This latter "sliding scale approach" allows a plaintiff to make a lesser

1  showing of likelihood of success provided he will suffer substantial harm in the absence
2  of relief. *Id.* at 1133.

3          Temporary restraining orders are governed by Rule 65(b).  A TRO lasts for only
4  14 days and may only be extended an additional 14 days for good cause shown or upon
5  consent of the opposing party. Rule 65(b), Fed.R.Civ.P. If a TRO is granted, the motion
6  for a preliminary injunction must be heard at the earliest possible time and takes
7  precedence over all matters except older matters of the same character. *Id.*

8          Under the Rule, a temporary injunction/TRO may not be issued without
9  imposition of a bond or other security upon the applicant. Rule 65(c), Fed.R.Civ.P. The
10 district court, however, has wide discretion in setting the amount of the bond.
11 *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th
12 Cir. 2003). In fact, the amount may be set at zero if there is no evidence the party will
13 suffer damages from the injunction. *Id.*

14 **III.   Jurisdiction**

15         The Supreme Court has recognized that federal courts have jurisdiction to
16 entertain suits regarding the seating of a member of Congress in some situations.  *Powell*
17 *v. McCormack*, 395 U.S. 486 (1969).   However, not every election contest is
18 appropriately reviewed by a federal court.  *See e.g. Curry v. Baker*, 802 F.2d 1302, 1313
19 n. 6 (11th Cir. 1986) (permitting "any voter [to] invoke federal jurisdiction to review the
20 resolution of any vote tabulation or election contest with which he is dissatisfied [] would
21 effectively federalize contests of state and local elections").

22         Indeed, "with only a few narrow and well-defined exceptions, federal courts are
23 not authorized to meddle in local elections."  *Bonas v. Town of North Smithfield*, 265
24 F.3d 69, 74 (1st Cir. 2001).  Instances where federal jurisdiction over an election contest
25 may be invoked include where a discrete group of voters suffer a denial of equal
26 protection or where a denial of substantive due process occurs (i.e., the election process is
27 patently and fundamentally unfair).  *Id.; see also* 29 C.J.S. Election § 422 (Nov. 2014).

28

1    Nonetheless, "if aggrieved parties, without adequate explanation, do not come
2    forward before the election, they will be barred from the equitable relief of overturning
3    the results of the election." *Soules v. Kauaians for Nukolii Campaign Committee*, 849
4    F.2d 1176, 1180 (9th Cir. 1988); *see also Hart v. King*, 470 F.Supp. 1195 (D.C.Haw.
5    1979).

6    Indeed, Defendants and McSally argue that Plaintiffs' claims are brought too early
7    or too late. The statutory basis for an elector to contest a claim is set forth in Count VI –
8    a contest of the election on the bases set forth in A.R.S. § 16-672 is to be brought after
9    the secretary of state or governor has canvassed the election and declared the result.
10   A.R.S. § 16-673. That has not happened in this case. Additionally, Defendants argue
11   other bases for contesting the election must have been brought before the County Boards
12   of Supervisors canvassed the official results. A.R.S. § 16-642 and 16-672. However,
13   Plaintiffs' claim based on Arizona statutes is not based on those Arizona statutes. Rather,
14   they base their claims on other procedural Arizona statutes and constitutional violations.

15   Further, some of the claims brought by Plaintiffs do not appear to be reasonably
16   foreseeable. For example, if an elector knew his precinct had changed, that elector would
17   have gone to the correct precinct; similarly, it is not likely an elector would have reason
18   to suspect that a person reviewing signatures may not believe the signatures match.
19   There is no basis to conclude that the electors knew of the basis of the claims in advance
20   of the election.

21   Because there is an adequate explanation for not bringing some of the claims
22   earlier, the Court preliminarily finds that it has jurisdiction in this case to resolve whether
23   or not to grant a TRO. Further, the Court declines to abstain from exercising jurisdiction
24   pursuant to the *Younger* and *Burford* doctrines. *See Younger v. Harris*, 401 U.S. 37
25   (1971); *Burford v. Sun Oil Co.*, 319 U.S. 315, 334 (1943).

26   ///
27   ///
28   ///

IV.     **Discussion**

A.      **No Likelihood of Success on the Merits of the Federal Claims**[1]

The Court finds that Plaintiffs have not met their burden to show either likelihood of success on the merits or serious questions going to the merits.  They have the burden and have not shown a pervasive error that undermines the integrity of the vote.

As to the second, third, fourth, fifth, and sixth categories of alleged errors—voters who signed both their registration form and their ballot affidavit and still had their ballot rejected for signature mismatch issues (27 ballots); unsigned early (8 ballots): unsigned provisional ballots (8 ballots); failure by election officials to direct voters who had moved to the proper precinct (31 ballots); misleading or erroneous statements by election officials regarding proper precinct—Plaintiffs raise both federal and state claims.

The federal claims are for violations of equal protection and due process.

Regarding the signature mismatch issues, Plaintiffs cite to the State Elections Procedure Manual, which they allege has the force of law.  It permits a voter to explain that he or she did vote and why the signatures do not match.  They argue that the attached declarations constitute such explanations.   They argue an equal protection violation based on a lack of state-wide standards for determining when signatures do not match and how determinations can be cured. It is unclear what standards either Pima or Cochise County applied to determine a mismatch and whether the cure process is arbitrary. Pima County arbitrarily asserted that the deadline for curing signature-mismatch ballots was

---

[1] The Supreme Court of Arizona has stated that "'election contests are purely statutory, unknown to the common law, and are neither actions at law nor suits in equity, but are special proceedings.'"  *Griffin v. Buzard*, 86 Ariz. 166, 342 P.2d 201 (Ariz. 1959); *Fish v. Redeker*, 2 Ariz.App. 602, 411 P.2d 40 (1966).  Arizona permits contests of elections as set forth in A.R.S. § 16-671 *et seq*.  Plaintiffs acknowledge that their state law claims are not included in A.R.S. § 16-672, which sets forth the grounds for contesting an election. In light of *Griffin*, it appears that statutory contests not based on the delineated claims do not state a claim and, therefore, are not valid grounds for injunctive relief.

noon on November 8th and then changed the deadline to close of business on November 9th, while Cochise County used Election Day as the deadline for curing signature-mismatch ballots. [Declaration of Kurt Bagley ¶ 6 ("Bagley Decl."); Decl. Van Nuys III ¶ 3].  Plaintiffs also claim this unduly burdens a fundamental right because the lack of standards ensures arbitrary and disparate treatment, citing *Bush v. Gore*, 531 U.S. 98, 104-06 (2000).  In assessing whether an electoral practice imposes such a burden, a court must "weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  Plaintiffs argue that failing to count the ballots imposes a severe burden and refusing to count serves no legitimate state interest.

They assert a due process violation because the state can regulate absentee voting but it cannot disqualify ballots without affording appropriate due process.  *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990).

As to unsigned early ballots, Plaintiffs argue that until approximately the Thursday before Election Day, Pima County mailed ballots back to early voters who failed to sign their ballot affidavit to provide an opportunity to correct the issue. Cochise County called at least some such voters prior to Election Day to inform them of the oversight and/or sent an affidavit for the voters to return by Election Day. Neither county took any action to cure unsigned early ballots after Election Day. [Quinn-Quesada Decl. ¶¶ 3-4]. Plaintiffs appear to argue an equal protection violation based on arbitrary and inconsistent rules and lack of a rational basis to distinguish between permitting a post-election cure for a mismatched signature but not to permit such a cure where a ballot has not been signed.

Regarding unsigned provisional ballots, Plaintiffs argue that because poll workers are required by the Elections Procedure Manual to sign the provisional ballot form that is

1    attached to the provisional ballot envelope, casting of an unsigned provisional ballot

2    necessarily reflects either that a poll worker looked at the unsigned ballot yet failed to

3    inform the voter that it had not been signed or that the poll worker failed to sign the

4    provisional ballot. [*See, e.g.*, Hamilton Decl., Ex. E, Tab E (Troutman Decl. ¶¶ 3-5).]

5    The unsigned provisional ballots would have been signed if the State had ensured that

6    poll workers took the straight-forward step of ensuring that voters had signed their

7    provisional ballots.

8          Regarding erroneous statements as to voting in the proper precinct, Plaintiffs

9    assert equal protection and due process claims based on poll workers failure to direct

10   voters to the proper polling place.

11         Plaintiffs cite primarily to *Bush v. Gore*, 531 U.S. 98, 104-06 (2000), to argue

12   disparate treatment based on allegedly arbitrary procedures and to *Northeast Ohio*

13   *Coalition for the Homeless v. Husted (NEOCH)*, 696 F.3d 580, 598 (6th Cir. 2012).  But

14   the present case is distinguishable from both *Bush v. Gore* and *NEOCH*.

15         *Bush v. Gore* involved the 2000 presidential election and the failure of Florida

16   voting machines to fully punch out the chads that represented the vote for a particular

17   candidate; chads were left hanging by corners or were merely indented.  531 U.S. at 102,

18   105.  As a result, thousands of votes were not counted.  After a flurry of legal actions, the

19   Florida Supreme Court ordered that when recounting votes, the intent of the voter be

20   determined from the ballot.  As the United States Supreme Court noted, this was not

21   problematic as an abstract proposition; the problem was the absence of specific standards

22   to ensure equal application.  *Id.* at 106.  The evidence showed that "the standards for

23   accepting or rejecting contested ballots might vary not only from county to county but

24   indeed within a single county from one recount team to another."  *Id.*

25         In addition, the Supreme Court specifically noted that

26         [t]he question before the Court is not whether local entities, in the exercise
         of their expertise, may develop different systems for implementing
27         elections. Instead, we are presented with a situation where a state court with
         the power to assure uniformity has ordered a statewide recount with
28         minimal procedural safeguards. When a court orders a statewide remedy,
         there must be at least some assurance that the rudimentary requirements of

equal treatment and fundamental fairness are satisfied.

*Id*. at 109.   In other words, the Court did not invalidate different county systems regarding implementation of election procedures.

In addition, a rational basis standard applies to state regulations that do not burden the fundamental right to vote; strict scrutiny applies when a state's restriction imposes "severe" burdens.  *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011), citing *Burdick*, 504 US at 434; *NEOCH*, 696 F.3d 580, at 592 (6th Cir. 2012) , citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, (1969) and *Burdick*, 504 U.S. at 434. For the majority of cases falling between these extremes, courts apply the "flexible" *Anderson/ Burdick* balancing test.  *NEOCH*, 696 F.3d at 592.

In *NEOCH*, the court of appeals found that the plaintiffs "demonstrated that their right to vote is . . . burdened by" Ohio's law that rejects wrong-precinct ballots regardless of poll-worker error, and therefore the "[t]he *Anderson–Burdick* standard . . . applies." 696 F.3d at 592, citing *Obama for America v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012). But in *NEOCH*, the record showed a "'systemic' disqualification of thousands of wrong-precinct provisional ballots and a strong likelihood that the majority of these miscast votes result from poll-worker error."  *Id.* at 593.  The court noted that although the number and frequency of disqualifications varied from "county to county, the problem as a whole is systemic and statewide."  *Id.* at 586.  In addition, the challenge by the voters was a pre-election challenge, not post-election as here.

In *Crawford v. Marion County Election Board*, 533 U.S. 181 (2008), voters challenged as an equal protection violation the state law requiring government issued photo identification to vote.  The Court noted that it had not identified any litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters.  *Id.* at 191.   "However slight that burden may appear, it must be justified by relevant and legitimate state interests "sufficiently weighty to justify the limitation."  Plaintiffs note the language regarding the burden on an individual voter.  But plainly the issue in *Crawford* involved potentially thousands of

voters, and Plaintiffs cite no cases finding constitutional violations where only small numbers of voters were affected by polling place or counting error.

The Ninth Circuit draws a distinction between "garden variety" election irregularities and a pervasive error that undermines the integrity of the vote. *Bennett v. Yoshima*, 140 F.3d 1218, 1226 (9th Cir. 1998). *Bennett* is not inconsistent with *Burdick* or *Crawford*. In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election. *Gold v. Feinberg*, 101 F.3d 796, 801 (2d Cir.1996) (human error resulting in miscounting of votes, presence of ineligible candidates on ballot, and delay in arrival of voting machines); *Curry v. Baker*, 802 F.2d 1302, 1316 (11th Cir.1986) (allegedly inadequate state response to illegal cross-over voting); *Bodine v. Elkhart County Elec. Bd.*, 788 F.2d 1270, 1272 (7th Cir.1986) (mechanical and human error in counting votes); *Hendon v. North Carolina State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir.1983) (technical deficiencies in printing ballots); *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir.1980) (negligent vote counting); *Hennings v. Grafton*, 523 F.2d 861, 864–65 (7th Cir.1975) (malfunctioning of voting machines); *Pettengill v. Putnam County R–1 School Dist.*, 472 F.2d 121, 122 (8th Cir.1973) (counting some votes that were illegally cast); *Powell v. Power*, 436 F.2d 84 (2d Cir.1970) (non-party members mistakenly allowed to vote in congressional primary); *Johnson v. Hood*, 430 F.2d 610, 613 (5th Cir.1970) (arbitrary rejection of 10 ballots).

To illustrate election problems warranting federal intervention, the *Bennett* court pointed to *Griffin v. Burns*, 570 F.2d 1065 (1st Cir.1978). 140 F.3d at 1220. There, absentee and shut-in voters were allowed to use mail-in ballots to vote in a primary election for a city council seat but after the election, the Rhode Island Supreme Court found "no constitutional or statutory basis for allowing absentee and shut-in voters to cast their votes in a primary election," and invalidated the ballots. *Id.* at 1068. Disenfranchised voters sued in federal court, arguing that their constitutional rights had been violated. *Griffin* allowed the claims to proceed because "Rhode Island could not,

constitutionally, invalidate the absentee and shut-in ballots that state officials had offered to the voters in this primary, where the effect of the state's action had been to induce the voters to vote by this means rather than in person." *Id.* at 1074. "If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots." *Id.* at 1077.

In *Krieger v. City of Peoria*, 2014 WL 4187500 (D. Ariz. 2014), the district court recently considered a challenge by a candidate whose name was omitted from early voting ballots. The court cited to *Bennett* and noted that *Griffin v. Burns*, 570 F. 2d 1065 (1st Cir. 1978), provides helpful guidance on the dividing line between garden variety irregularities and a pervasive error that undermines the integrity of the vote:

> While there is no single bright line to distinguish [the two cases] from the cases ... in which federal courts have declined to intervene, it is apparent that in both cases the attack was, broadly, upon the fairness of the official terms and procedures under which the election was conducted. The federal courts were not asked to count and validate ballots and enter into the details of the administration of the election. Rather they were confronted with an officially-sponsored election procedure which, in its basic aspect, was flawed. Due process, "representing a profound attitude of fairness between ... individual and government, is implicated in such a situation".

*Id.* at 1078 (internal citation omitted). Here, Plaintiffs' claims are not based broadly on the fairness of the terms and procedures of the election; rather they focus on individual and infrequent polling-place irregularities and verification procedures. Moreover, they are asking the Court to validate ballots.

As noted, Plaintiffs point to no case where scattered election-procedure violations regarding a small number of voters was found to raise a constitutional violation warranting a federal court's entry into the details of the administration of an election. Certainly, they point to no cases where a court enjoined further action by state electoral officials after the election. Thus, while the Court is not unsympathetic to the plight of individual voters whose ballots may have been improperly rejected, the Court finds that

Plaintiffs have not met their burden to show pervasive error that undermines the integrity of the election.

As to violations of the Help America Vote Act, HAVA is clear that an eligible voter's "provisional ballot shall be counted as a vote in that election in accordance with State law." 52 U.S.C. § 21082(a)(4). To refuse to count all eligible voters' ballots for those elections in which they may legally vote is a violation of federal law.

HAVA provides that provisional votes shall be counted "[i]f the appropriate *State or local election official . . . determines that the individual is eligible under State law to vote*, the individual's provisional ballot shall be counted as a vote in that election *in accordance with State law*." 52 U.S.C. § 21082(a)(4) (emphasis added). There has been no determination that these voters were not eligible to vote. On the other hand, HAVA does not contain language that requires that the provisional votes be counted; it is directed to providing provisional votes. As the Sixth Circuit noted, the Help America Vote Act's (HAVA) provisional voting section is designed to recognize, and compensate for, the improbability of "perfect knowledge" on the part of local election officials. *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004).

Thus, the Court finds that Plaintiffs have not met their burden to show a likelihood of success on the merits of equal protection or due process claims or a claim under the HAVA or serious questions going to the merits.

## B. Irreparable Harm

The Supreme Court has stated that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964); *see also Mitchell v. Cuomo*, 748 F.2d 804, 806 (2nd Cir.1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *Cardona v. Oakland Unified School Dist., California*, 758 F.Supp. 837 (N.D.Cal. 1992) (citations omitted) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury."). The Court finds that,

1   because the votes of the three individual voter Plaintiffs will not count if a TRO is not

2   issued, Plaintiffs have met their burden of showing irreparable harm.  However, Plaintiff

3   Ron Barber for Congress' allegation of irreparable harm is speculative at this juncture.

4   Even if all 133 votes are counted, it is undisputed that Martha McSally wins the election

5   because she leads by a margin of 161 votes at this time.

6          **C.     Balance of the Equities and Public Interest**

7          Plaintiffs argue that the Defendants will suffer no harm if the requested relief is

8   granted and that the Secretary of State will merely need to update the vote totals for the

9   2014 election to include the votes in the contested ballots.  They assert that any nominal

10  burden from counting ballots that should have been counted in the first place is

11  outweighed by the interests of the three individual Plaintiffs who were denied the right to

12  vote. They also contend that it is always in the public interest to prevent the violation of a

13  party's constitutional rights.

14         Defendants argue that they will suffer significant harm.  McSally asserts that harm

15  to her and all other state and local candidates will result from the entering of a restraining

16  order and preliminary injunction, creating an unwarranted ripple effect through all other

17  races.  Further, local and state officials at oral argument expressed concern about the

18  logistics of reviewing again the 133 ballots and whether this would be unfair to other

19  voters whose ballots were already rejected for similar reasons.  In other words, a different

20  review process would take place implicating the fairness of the election as a whole.

21         The Secretary of State asserts that his Office has been taking action to prepare for

22  the eventual recount under A.R.S. § 16-661 *et seq*. and for the possible filing of an

23  election contest under A.R.S. § 16-672 *et seq*. To that end, the Secretary of State has been

24  working constantly since Election Day to finalize the results with the Official Canvass, to

25  anticipate and plan for the recount, and to anticipate and plan for a contest. These state

26  procedures require numerous actions being taken by the Secretary of State's staff, the

27  county election personnel, and legal counsel. This lawsuit, however, was unanticipated

28

1   and, for the reasons set forth in McSally's Response and Motion to Dismiss, is

2   inappropriate and disruptive to those state processes that exist.

3          The Secretary of State also asserts that he has no discretion to delay the Official

4   Canvass. A.R.S. § 16-648(A) provides that "On the fourth Monday following a general

5   election, the secretary of state, in the presence of the governor and the attorney general,

6   shall canvass all offices for which the nominees filed nominating petitions and papers

7   with the secretary of state pursuant to § 16-311, subsection E."  The Secretary of State

8   may delay the Canvass only if the Secretary of State has not yet received all of the county

9   canvasses by that first Monday after the general election. A.R.S. § 16-648(C). As of

10   November 24, 2014, the Secretary of State has received all of the county canvasses.

11   Delaying the canvass delays the state processes from occurring, which will delay resolution of

12   this election with respect to this office.

13          The Court finds that the hardship to Defendants and the electorate of the Second

14   Congressional District outweighs the hardship to Plaintiffs.  Like the voter challenge in

15   *Southwest Voter Registration Education Project v. Shelley*, 344 F.3d 914, 919 (9th Cir.

16   2003), hardship falls not only on the Secretary of State but on all citizens of the district.

17   "The public interest is significantly affected. For this reason our law recognizes that

18   election cases are different from ordinary injunction cases. . . . Interference with

19   impending elections is extraordinary, and interference with an election after voting has

20   begun is unprecedented."  *Id.* (internal citations omitted.)

21          Thus, the Court finds that Plaintiffs have not met their burden for the TRO they

22   request, and the Application is denied.[2]

23   ///

24   ///

25   ///

26   ///

27

28          [2] It was not discussed at the November 26 hearing whether Plaintiff will continue
    to seek a preliminary injunction if a TRO is denied.

1    **IT IS ORDERED** that the Application for a Temporary Restraining Order (Doc.

2    2) is denied.  The Clerk of Court is directed that the docket should reflect that the Motion

3    for a Preliminary Injunction (Doc. 2) remains pending.

4    Dated this 27th day of November, 2014.

5

6

7    _____
     Cindy K. Jorgenson
8    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28